INDEPENDENT SCHOOL DISTRICT NO. 877 v. LOBERG
PLUMBING & HEATING COMPANY.

123 N. W. (2d) 793.

October 11, 1963—No. 38,735.

*Robins, Davis & Lyons, S. Robins, Harding A. Orren,* and *Lawrence Zelle,* for appellant.

*Meagher, Geer, Markham & Anderson, M. J. Coyne,* and *O. C. Adamson II,* for respondent Loberg.

*Arthur H. Lindeman,* for respondent Kerntile.

ROGOSHESKE, JUSTICE.

Plaintiff, upon dismissal of its action as to certain defendants, appeals from an order denying its motion for a new trial.

The problem presented concerns the interpretation of a building construction contract to ascertain the intention of the parties with respect to the contractor's liability for alleged negligence in causing a fire which extensively damaged a school building after the construction was substantially completed and the building was accepted and in use by plaintiff.

In the spring of 1956, plaintiff entered into a contract with Patch and Erickson, architects, relating to the construction of a new elementary school in the city of Buffalo, Minnesota. Under this contract, plans and specifications were drafted by Robert D. Hanson, an employee of Patch and Erickson. After approval of such plans by the school board of plaintiff, bids were solicited and accepted. Thereafter, in November 1956, pursuant to the contract with the architects, construction contracts incorporating the plans and specifications were similarly drafted and executed by the plaintiff and the successful bidders. Defendant Loberg Plumbing & Heating Company (hereinafter Loberg) contracted for the plumbing and heating work. Defendants Edward S. Kern and Frank Persons, doing business as The Kerntile Company, furnished the acoustical tile used in the construction as a subcontractor.

In September 1957, the building was occupied for school purposes although construction was not completed. On November 13, 1957, plaintiff, by its school board, inspected the new building and accepted it as completed, subject to "punch lists" of certain items which inspection revealed were to be corrected by various contractors, including Loberg, before final payment. On December 27, 1958, Loberg's "punch list" items were certified as completed, and final payment was authorized and made to Loberg shortly after January 20,

1958. Sometime after payment, on January 30, 1958, a leak developed in the plumbing. Plaintiff called upon Loberg to make repairs in accordance with § 2.30 of the construction contract under which the contractors guaranteed all workmanship and material for a period of one year after acceptance of the work. (The guarantee required the contractors, upon notice, to immediately proceed to repair any defects or replace any faulty material during the guarantee period.) Sometime after completion of the repairs, a fire occurred which damaged the building to the extent of $173,366.92.

At the time of the fire, plaintiff was insured against loss by fire and other named perils under several policies of insurance in which it alone was named as insured. After the insurers had made full payment for all damages claimed, plaintiff commenced this action against Loberg, one of it employees, several other contractors, and the architect, alleging that the fire was caused by negligence in repairing the defect in the plumbing and in specifying and installing nonfireproof acoustical tile. Defendants denied liability and interposed various defenses, including the defense that the terms of the construction contract exonerated them from liability to plaintiff for damage or destruction of the property by fire, however caused. The two defendants involved in this appeal also counterclaimed for damages claimed to result from plaintiff's breach of the construction contract by failing to maintain fire insurance in which they were named as joint insureds with the plaintiff.[1] As the matter comes before us, we are concerned solely with reviewing the trial court's decision that the contract exonerated the defendants from liability for negligently causing the fire. The court, with the parties' acquiescence, declined at this time to rule on the merits of defendants' counterclaim.

From the evidence submitted at trial, the court determined that Loberg's repair of the leaking pipe, although after completion, accept-

---

[1]Prior to trial, the action was dismissed as to the architect and general contractor by stipulation. At the close of the trial, it was dismissed as to Loberg and Edward S. Kern and Frank Persons, d. b. a. The Kerntile Company, which resulted in this appeal. It has not been dismissed as to other defendants.

ance, and payment, was in the performance of a contractual obligation; that the parties to the contract intended to impose upon plaintiff the obligation to maintain fire insurance, with the contractors named as joint insureds; and that they also intended to exonerate the contracting parties from any liability for damages by fire resulting from any party's negligence. The court thus concluded to dismiss plaintiff's action on the merits without prejudice to defendants' counterclaims.[2] The pertinent provisions of the contract are as follows:

"2.8 OWNER

"The term 'Owner' as used in this specification refers to Independent School District No. 23, Buffalo, Minnesota.

\*     \*     \*     \*     \*

"2.21 TERMS OF PAYMENT

"On or after the first day of each month during the progress of the work, each Prime Contractor shall submit to the Architect an Application for Payment (AIA Form 702) and a Certificate for Payment (AIA Form 703). Both forms are available from the Architect and will be submitted in quadruplicate. The Application for Payment will be based on the Contractor's Cost Breakdown and will include all labor accomplished and materials incorporated in the work or delivered to the site since the previous Application for Payment was made.

"Upon approval by the Architect, the Application and Certificate for Payment will be forwarded to the Owner, who will pay 90% of the amount of the Application and will retain 10%. The 10% retained will be paid within 30 days after the substantial completion of the work, provided the work be then completed and accepted by Owner and the contract fully performed.

\*     \*     \*     \*     \*

---

[2] It was stipulated at trial that the facts claimed to support Loberg's defense applied with equal force to the defense of The Kerntile Company; the latter, therefore, offered no testimony, relying entirely on the testimony offered by Loberg.

**"2.30 ONE YEAR GUARANTEE**

"For a period of one year after acceptance of the work, each Prime Contractor shall guarantee all workmanship and materials included in his contract and if, during guarantee period, any defects or faulty materials are found, he shall immediately upon notification from Architect, proceed to replace and repair same without cost to Owner, together with any damage to finish, fixtures, equipment or furnishings that may be damaged due to defective work or materials. Considerations will be allowed for natural use of building during this time.

**"2.31 CONTRACTORS LIABILITY INSURANCE**

"Each Prime Contractor shall maintain such insurance as will protect him from claims under the Workmen's Compensation Acts and from claims for damages because of bodily injury, including death, which may arise both out of and during operations under this contract, whether such operations be by himself or by any subcontractor or anyone directly or indirectly employed by either of them. This insurance shall be written for not less than the limits of liability as specified as follows:

"1. Contractors Public Liability Insurance $100-300 thousand.

"2. Contractors Contingent Liability Insurance $100-300 thousand.

"3. Property Damage Insurance $50-100 thousand.

"4. Automotive Insurance.

"A. Public Liability $100-300 thousand.

"B. Property Damage $50-50 thousand.

"This insurance need not cover any liability imposed by Article 31 of Section 1. Certificates of such insurance shall be filed with Owner and Architect. The contractor also shall maintain insurance required under any other Employee Benefits Acts in force at the place of building. Property Damage, Liability, including claims due to automobiles, shall be issued with Bodily Injury Claims under General Liability policy.

"All Liability insurance required herein shall be under Comprehensive General and Automobile Bodily Injury, and Property Damage form policy. Certificates of such aforementioned insurance shall be filed with the Owner and the Architect.

## "2.32 OWNERS LIABILITY INSURANCE

"The Owner shall be responsible for and at his option may maintain such insurance as will protect him from his contingent liability to others for damages because of bodily injury, including death, which may arise from operations under this contract, and any other liability for damages which the Contractor is required to insure under any provision of this contract.

## "2.33 BUILDERS RISK INSURANCE (FIRE INSURANCE)

"The Owner shall effect and maintain fire insurance, including as minimum coverage fire, extended coverage, and vandalism and malicious mischief insurance on a completed value form, upon the entire structure on which the work of this contract is to be done to one hundred percent of the insurable value thereof, including items of labor and materials connected therewith whether in or adjacent to the structure insured, materials in place, or to be used as part of the permanent construction including surplus materials, shanties, protective fences, bridges or temporary structures, miscellaneous materials and supplies incident to the work, and such scaffoldings, stagings, towers, forms and equipment as are not owned or rented by the contractor, the cost of which is included in the cost of the work. *Exclusions*: This insurance does not cover any tools owned by mechanics, any tools, equipment, scaffolding, staging, towers, and forms owned or rented by contractors, the capital value of which is not included in cost of work, or any cook shanties, bunk houses or other structures erected for housing the workman. The loss, if any, is to be made adjustable with and payable to the Owner as Trustee for the insureds as their interests may appear, except in such cases as may require payment of all or a portion of said insurance to be made to a mortgagee as his interests may appear.

"All contractors, subcontractors, architects and engineers shall be named or designated in such capacity as insured jointly with the Owner in all policies, all of which shall be open to the Contractor's inspection. The Owner shall accomplish this by having an appropriate rider added to all policies as follows:

"The (Name of Insurance Company) does insure (Names of Own-

er, Contractor, Architect, Engineers) and all other contractors and subcontractors with them at the described premises. Certificates of such insurance shall be filed with the contractor, architect and engineer and if any of them so requires, certified copies of all policies shall be filed with them. If the Owner fails to effect or maintain insurance as above and so notifies the Contractor, the Contractor may insure his own interest and that of the subcontractors and charge the cost thereof to the Owner. If the Contractor is damaged by failure of the Owner to maintain such insurance or to so notify the Contractor, he may recover as stipulated in the contract for recovery of damages. If extended coverage or other special insurance not herein provided for is required by the Contractor, the Owner shall effect such insurance at the Contractor's expense by appropriate riders to his fire insurance policy.

"If required in writing by any party in interest, the Owner as Trustee shall, upon the occurrence of loss, give bond for the proper performance of his duties. He shall deposit any money received from insurance in an account separate from all his other funds and he shall distribute it in accordance with such agreement as the parties in interest may reach, or under an award of arbitrators appointed, one by the Owner, another by joint action of the other parties in interest, all other procedure being as provided elsewhere in the contracts for arbitration. If after loss, no special agreement is made, replacement of injured work shall be ordered and executed as provided for changes in the work.

"The Trustee shall have power to adjust and settle any loss with the insurers unless one of the Contractors interested shall object in writing within three working days of the occurrence of loss, and thereupon arbitrators shall be chosen as above. The Trustee shall in that case, make settlement with the insurers in accordance of the directions of such arbitrators, who shall also, if distribution by arbitration is required, direct such distribution.

"*Subrogation Clause*: It is hereby stipulated that this insurance shall not be invalidated should the insured waive in writing prior to a loss,

any or all rights of recovery against any party for loss occurring to the property described herein.

"2.34 DAMAGES

"If either party to this contract should suffer damage in any manner other than fire or extended coverage perils, or Vandalism or Malicious Mischief because of any wrongful act or neglect of the other party, or of anyone employed by him, then he shall be reimbursed by the other party for such damage, provided, the Owner shall be responsible for and at his option insure against loss of use of any of his existing property, due to Fire or otherwise, however caused.

"Claims under this clause shall be made in writing to the party liable within a reasonable time of the first observance of such damage and not later than the time of final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjusted by agreement or arbitration.

"The Contractor is relieved of responsibility for damages to the work due to causes beyond the control of and without fault or negligence of the Contractor."

Plaintiff contends in its initial brief that defendant failed to sustain the burden of proof to establish that § 2.34 or § 2.33, or any provision of the contract viewed in its entirety, disclosed a clear and unambiguous intention to exonerate the contractors from liability for negligence in causing the fire; that § 2.34 deals only with the procedure for the assertion of damage claims and that it omitted claims for loss resulting from fire, however caused, because § 2.33, requiring the maintenance of "builders risk insurance," provides for the procedure to adjust such a loss; that the insurance required by § 2.33 is a particular type of insurance which can be maintained only during the course of construction; and that the fire occurred after the building was completed and accepted, at a time when plaintiff's obligation to maintain insurance to protect against the risk of fire had lapsed and when the pertinent provisions concerning exoneration, however interpreted, were no longer in effect.

Loberg contends that §§ 2.34 and 2.33 separately, and in the context of the entire contract, clearly express an intention that each party

release the other from liability for damages from fire, however caused, and an agreement that plaintiff would maintain fire insurance for the benefit of the contractors, and that these contractual rights and duties were in effect at the time of the fire. Loberg argues also that the findings of the court with respect to the intention of the parties were justified whether the court proceeded on the theory that the contract was unambiguous, and therefore its construction is a matter of law, or that it was ambiguous and required a construction based also on extrinsic evidence.

■ It is well established that the parties could, by contract, without violation of public policy, protect themselves against liability resulting from their own negligence.[3] Such a contractual provision is held not to contravene public policy where the negligence claimed, as here, is only an "undesired possibility" in the performance of the contract and is not induced by the contract.[4] Plaintiff argues that an exculpating provision must clearly express the intention of the parties and that the language used is subject to strict construction, requiring any doubts to be resolved against effecting exoneration from liability for negligence. We are referred to no decisions of this court supporting such a rule. On the contrary, where such a contractual provision is within the range of permissible agreement and the parties' intention to exonerate reasonably appears, public policy dictates that they be bound by the agreement made. As was said in N. P. Ry. Co. v. Thornton Bros. Co. 206 Minn. 193, 196, 288 N. W. 226, 227:

"If a contract transgresses the law or contravenes public policy, it is void. If it does neither, the parties are within their rights and the contract should not have an arbitrary, that is, an unduly liberal or harshly strict, construction, but a fair construction that will accomplish its stated purpose. That is the rule we apply to statutes * * * and we see no reason why it should not apply also in the field of con-

---

[3]Commercial Union Assur. Co. Ltd. v. Foley Brothers, 141 Minn. 258, 169 N. W. 793; N. P. Ry. Co. v. Thornton Bros. Co. 206 Minn. 193, 288 N. W. 226; James Quirk Milling Co. v. Minneapolis & St. L. R. Co. 98 Minn. 22, 107 N. W. 742.

[4]Restatement, Contracts, § 572.

tract law. Our duty is the same in both domains—to effectuate the declared purpose of the statute, if within constitutional power, and of the contract, if within the scope of lawful contractual objectives."

■ No reasons appear justifying any departure from the rule of fair construction in this case. Applying this rule, we shall be obliged to affirm the decision of the trial court unless its interpretation of the pertinent provisions of the contract is unreasonable and contrary to the manifest intention of the parties, as disclosed by the language used and the inferences to be drawn therefrom, and is, therefore, without reasonable support in the written or extrinsic evidence.[5]

We have no difficulty in agreeing with the trial court that the parties clearly intended that, during the period of construction, each party was to be exonerated from liability for fire damage caused by any party's negligence. Contrary to plaintiff's contention, § 2.34 appears susceptible of no other construction if we are to give effect to the language recognizing the parties' common-law liability for damages suffered in any manner because of any wrongful act or neglect in all instances "other than fire or extended coverage perils, or Vandalism or Malicious Mischief." Furthermore, the last part of the first paragraph of this provision, emphasizing that the owner will be responsible for loss of use due to fire, which he may insure against, can have meaning only because of the preceding language exempting liability for damages suffered from fire. The last paragraph of § 2.34 is also significant and consonant with an intention to exclude liability for fire damage caused by negligence. As plaintiff urges, it was evidently inserted to abrogate the common-law rule that a builder is not relieved of his contractual obligation to build where the building is destroyed or damaged by fire before completion, whether or not the fire was occasioned

---

[5]Village of Minneota v. Fairbanks, Morse & Co. 226 Minn. 1, 31 N. W. (2d) 920; Sommers v. City of St. Paul, 183 Minn. 545, 237 N. W. 427.

The trial court did not reveal whether the findings were arrived at upon the basis that the contract was regarded as unambiguous and therefore its construction was a matter of law, or as ambiguous and requiring resort to the extrinsic evidence offered in aid of interpretation. Sufficient support in the evidence must, therefore, be found for both approaches.

by the negligence of the builder. This provision limits the contractor's obligation to rebuild to instances where the loss is due to his fault or negligence. Obviously, the exception concerning fire damage in the first paragraph of § 2.34 must include fire caused by negligence or the language of the last paragraph would be meaningless and a nullity. Such a conclusion squares with the cardinal rule of construction that any interpretation which would render a provision meaningless should be avoided on the assumption that the parties intended the language used by them to have some effect.[6]

Of greatest significance in revealing this intention of the parties are the stipulations in § 2.33 pertaining to the plaintiff's obligation to effect and maintain fire insurance upon the building on which the work called for by the contract was to be done. In searching for contractual intention, we must, of course, read the contract in its entirety, considering it in the light of the subject matter, the object and purposes of the parties, and the natural meaning of the language used, to the end that the various provisions may be "made to harmonize and unite in a consistent agreement in consonance with the intention of the parties."[7] Section 2.33 unmistakably discloses an intention of the parties to place the risk of loss by fire upon insurance companies. That it was intended that such insurance was to be for the mutual benefit of the owner and the contractors could hardly be more clearly revealed than by the stipulations requiring that the contractors be designated as insureds in all policies procured and subjecting such policies to their inspection, requiring minimum coverage, designating specific properties to be included, calling for the filing of certificates of insurance with the contractors, and providing for payment of any loss to the owner as trustee. Moreover, these provisions when read in conjunction with the other provisions requiring insurance of various types, disclose a studied plan for using insurance to protect against the risks inherent in the performance of the contractual obligations

---

[6]Casey v. Brotherhood, 197 Minn. 189, 266 N. W. 737; Commercial Union Assur. Co. Ltd. v. Foley Brothers, *supra.*

[7]Lawton v. Joesting, 96 Minn. 163, 167, 104 N. W. 830, 832; 4 Dunnell, Dig. (3 ed.) §§ 1823 and 1827.

of the parties. Such provisions are surely not unusual in a business sense, for exposures to the risks enumerated in this contract are important factors in determining anticipated costs of construction and are reflected in the bids submitted.[8] There are cases involving leases where the lessee was exonerated from liability for his negligence and where similar contractual provisions, although set out in broader terms and with less particularity, were construed to provide insurance protection for the benefit of the parties and held exculpatory in effect. These provisions are regarded as agreements such as would normally be expected of intelligent men of affairs.[9] Viewed in this perspective, we hold it would be unreasonable to conclude otherwise than that the language of § 2.34, when viewed with § 2.33 and the entire contract, was designed to express the intent that the responsibility of loss by fire, however caused, was placed upon insurance companies, and that the contractors were relieved from any liability for damages thus resulting.

It should be noted that during the period of construction the effect of these provisions is not only to afford to the contractor protection against loss of a property interest in the materials and labor furnished, but also to use fire insurance as a means of affording protection against the contractor's own negligence. The latter effect does mean that a fire insurance policy is used to cover risks more appropriately covered, under insurance concepts, by casualty insurance. However, this circumstance certainly should not be used to thwart the intention of the contracting parties. That such effect was within the contemplation of the parties seems apparent from the last paragraph of § 2.33 wherein the parties express the caveat, presumably to advise

---

[8]Newport News Shipbuilding & Dry Dock Co. v. United States (4 Cir.) 34 F. (2d) 100, certiorari denied, 280 U. S. 599, 50 S. Ct. 69, 74 L. ed. 645.

[9]Buckey v. Indianhead Truck Line, Inc. 234 Minn. 379, 48 N. W. (2d) 534; General Mills, Inc. v. Goldman (8 Cir.) 184 F. (2d) 359, certiorari denied, 340 U. S. 947, 71 S. Ct. 532, 95 L. ed. 683; N. P. Ry. Co. v. Thornton Bros. Co. *supra*; Cerny-Pickas & Co. v. C. R. Jahn Co. 7 Ill. (2d) 393, 131 N. E. (2d) 100; United States Fire Ins. Co. v. Phil-Mar Corp. 102 Ohio App. 561, 131 N. E. (2d) 444, affirmed, 166 Ohio St. 85, 139 N. E. (2d) 330. See, also, Weirick v. Hamm Realty Co. 179 Minn. 25, 228 N. W. 175.

the underwriters through plaintiff, that the insurance to be procured "shall not be invalidated should the insured waive in writing prior to a loss, any or all rights of recovery against any party for loss occurring to the property described herein."

Plaintiff relied most heavily, both at trial and in its brief, upon the argument that, regardless of the interpretation of the pertinent provisions, no protection against liability for damages resulting from fire was intended to be given the contractors after acceptance and final payment. We regard this as the most difficult aspect of the case. The exoneration created by § 2.34, viewed in conjunction with § 2.33, is not expressly stated to continue during the 1-year guarantee period provided by § 2.30. Nor is it expressly limited to the period of construction. The parties' intention in this respect must be ascertained by reasonable implication from the language used and by resort to extrinsic evidence, which may not be used to vary or contradict the natural meaning of the language of any provision of the contract.

The trial court found that both the obligation to maintain fire insurance and the contractor's freedom from liability continued until all contractual obligations, including those imposed by § 2.30, were completed. We believe there is reasonable support for finding that the parties so intended. It is undisputed that plaintiff, in recognition of its obligation, did procure and maintain fire insurance policies from November 20, 1956, until November 20, 1957, naming all required contractors as insureds. Upon expiration of the policies, they were replaced by policies in which plaintiff alone was named as the insured. This occurred when the building had been in use for almost 2 months and 1 week after the building was accepted as substantially complete. At the time of replacement, Loberg and other contractors continued to be obligated to perform work under the contract by way of completing items specified in the "punch list" and under the 1-year guarantee provision. The record also discloses that at the time of the loss on January 30, not all of the contractors or subcontractors had completed their work and received final payment, as had Loberg. Clearly, the plaintiff must be held to have violated the benefit-of-in-

surance provision as to such contractors at the time it replaced the policies without designating such contractors as joint insureds. That action also overlooked the release from liability for fire damage in § 2.34. While the parties set the time limit for making claims for damage against each other to "not later than the time of final payment," they expressly excepted claims arising "in the case of faulty work or materials." This language could only contemplate claims arising during the 1-year guarantee period; and as the trial court reasonably inferred, the whole of this provision was intended to govern the parties' liability to each other, including liability for damage from fire, during the 1-year guarantee period as well as during the period of construction.

Plaintiff in a reply brief (emphasized with persuasive vigor on oral argument) places the greatest weight of its argument on the facts that § 2.33 required "builders risk insurance" and that this "type" of insurance by its very terms can be maintained only during the period of construction, facts which plaintiff insists directly conflict with any inferred intention that the plaintiff was required to maintain insurance after the building was completed and final payment made, because the fulfillment of such an obligation was clearly impossible. This argument is buttressed by the assertion that upon completion, acceptance, and final payment the contractors no longer had an insurable interest in the building; and to afford them any benefit from a fire insurance policy amounts to converting such a policy into a liability policy.

An examination of the record demonstrates that the court in denying plaintiff's motion for amended findings found that § 2.33 did not require plaintiff to effect and maintain "builders risk insurance" in accordance with plaintiff's interpretation of that term. The evidence offered as an aid to understanding the terms used, concerning which the parties were in dispute, clearly supports such a finding. What is imprecisely called "builders risk insurance" is nothing more than a standard fire insurance policy to which a Form 17 C, the Uniform Standard Minnesota Builders Risk Completed Value Form, is attached. This rider is not the insurance policy but simply an endorsement appended to a standard fire policy. It does not designate those named

as insureds but provides for coverage for a provisional amount on a building while in the course of construction and unoccupied by the owner. The coverage at any given period of construction is such portion of the provisional amount specified as the actual value of the building at that time bears to the value on completion. Thereby, the premium rate is reduced to less than half the ordinary premium rate on a completed structure. Upon completion of the building, this endorsement is obviously as unavailable to the owner as is the reduced premium it justifies. Perhaps this is a partial explanation of plaintiff's action in replacing the policy when the building was occupied and accepted as substantially complete. Although the contract permitted taking advantage of such reduction in premium by effecting minimum coverage with a Builders Risk Completed Value Form endorsement when available, the interpretation of the language of § 2.33 that plaintiff was required to effect and maintain fire insurance in which the contractors were named as insureds upon the building on which the work of the contract was done—including the materials and equipment of the contractors—for the duration of the contractors' obligation, as found by the trial court, is consistent, reasonable, and justified by the evidence. Furthermore, § 2.30 imposed an express obligation on the contractors regarding their work under the contract, which bound them as fully as their obligation to furnish specified materials and labor prior to acceptance of the building. The consequence of a breach of either obligation would be an action for damages based on the contract. The parties imposed obligations which extended beyond acceptance and final payment. Acceptance started the period of guarantee running, and the contract was not fully performed by its terms until that period had run. Although the parties' exposure to the risks inherent in the project remained essentially the same, the exposure to the hazards of fire increased. A contractor's potential loss by fire for replacement materials and equipment may not have been as substantial during the guarantee period as during construction; but his potential liability to other parties to the contract for fire caused by his negligence was greatly increased. Thus, the whole plan of protecting against the risks inherent in the work to be per-

formed becomes most significant in revealing the intention of the parties. Since nothing in the contract expressly or by implication limits the benefit-of-insurance provision, both as to fire and casualty insurance, we are unable to see how the trial court's conclusion that the parties intended the protection to continue for the duration of the contract is unreasonable. Nor are we persuaded that the result should be different because Loberg, at the time of the loss, is claimed to have had no insurable interest in the building. The record does not show what materials or equipment it may have had in the building at the time of the loss. The fact that coverage of such was contemplated is, we believe, sufficient to answer the argument. But more important, what share of the proceeds from the fire policy it may be entitled to is not, as pointed out above, the only effect of the benefit-of-insurance provision. It was intended as well to provide indemnity against a claim for negligence. In the cases cited above, agreements to indemnify a lessee from negligence by the use of a fire policy were held binding, notwithstanding the absence of any insurable interest in the lessee. The existence of an insurable interest would undoubtedly be a decisive factor in agreements between an insurance company and its insureds, both in the issuance of a policy and the payment of a loss. Its relevance in contracts where the insurance company is not a party is only one factor bearing on the intention of the parties with respect to a benefit-of-insurance provision. Where there is no proof that the parties contracted with the concept of insurable interest in mind, the absence of an insurable interest in the building covered provides an insufficient basis under the facts of this case to infer an intention to limit or negative an agreement to exonerate from liability for negligence when such intention otherwise reasonably appears. We hold that the trial court correctly interpreted the contract to effect exoneration and to require the maintenance of insurance until the contract was fully performed. We further find no error in the court's rulings or in its considering the extrinsic evidence submitted.

Affirmed.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.