James **HURLBURT**, Plaintiff,

St. Paul Companies, Intervenor,

v.

**NORTHERN STATES POWER COMPANY, et al.,**
Defendants,

and

**KRAUS–ANDERSON INCORPORATED,**
Third–Party Plaintiff, Respondent,

v.

**IMPERIAL DEVELOPERS, INC.,** Third–Party Defendant, Appellant.

No. C0–94–1515.

Supreme Court of Minnesota.

June 27, 1996.

OPINION

COYNE, Justice.

What began as a fairly typical injured construction worker's action against a third party who is not connected to the worker's employment relationship has now resolved itself into a dispute between two insurers. James Hurlburt was injured in the course of his employment with Imperial Developers, Inc., the excavation and grading subcontractor on a construction project. Hurlburt commenced an action against Northern States Power Company and Kraus–Anderson Con-

struction Company, the general contractor on the project. Kraus–Anderson, as third-party plaintiff claiming a right of indemnity from its subcontractor, then brought in Imperial Developers, Inc. as third-party defendant. Relying on *Holmes v. Watson–Forsberg Co.,* 488 N.W.2d 473 (Minn.1992), the district court granted Kraus–Anderson partial summary judgment against Imperial Developers on the ground that the subcontractor had contracted to " 'cover' Kraus–Anderson with insurance or to indemnify to the extent of the insurance promised."

On trial of the main action, the jury found that plaintiff Hurlburt was 15% at fault with respect to his injury, that 85% of the causal negligence with respect to Hurlburt's injuries was attributable to Kraus–Anderson, and that neither Imperial Developers nor Northern States Power Company was negligent at all. Judgment in the amount of $902,700 was entered against Kraus–Anderson in favor of James Hurlburt.

Imperial Developers appealed from the judgment in the amount of $984,555.69 entered against Imperial Developers in favor of Kraus–Anderson, representing the following items:

| | |
|---|---|
| Amount of verdict payable by Kraus–Anderson | $902,700.00 |
| Pre- and post-verdict interest | 60,831.12 |
| Hurlburt's costs and disbursements | 21,024.57 |
| | $984,555.69 |

The judgment awarded to Kraus–Anderson, in addition to the $984,555.69 based on Hurlburt's claim, attorney fees and costs in the amount of $257,255.25 and provided that Imperial Developers should also be liable for all costs and attorney fees incurred in connection with any appeals. The court of appeals affirmed the judgment in all respects. We reverse.

The circumstances giving rise to the dispute between Kraus–Anderson and Imperial Developers are these:

In the spring of 1989 Rolche, Inc., as owner, engaged Kraus–Anderson to act as general contractor for the construction of the Hillwind Office Plaza in Fridley, Minnesota. Rolche and Kraus–Anderson entered into a written contract in the form promulgated in 1987 by the American Institute of Architects as AIA Document A111. In Article 11 of the General Conditions of the Contract for Construction, AIA Document A201–1987, entitled Insurance and Bonds, the following paragraphs appear:

## 11.1 CONTRACTOR'S LIABILITY INSURANCE

**11.1.1** The contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

Paragraph 11.1.1 goes on to describe seven types of claims to be covered by such insurance: workers' compensation; bodily injury, sickness, disease or death of a Kraus–Anderson employee or of any other person; "damages insured by usual personal injury liability coverage" sustained as a result of an offense related to the employment of the injured person; property damage other than to the Work of the contract; damages arising out of the ownership, maintenance or use of a motor vehicle; and contractual liability. Paragraph 11.1.3 required Kraus–Anderson to file certificates of insurance with the Owner prior to commencement of the Work of the contract.

On July 12, 1989 Kraus–Anderson, as contractor, and Imperial Developers, as Subcontractor, entered into a Standard Subcontract Agreement, 1985 edition, a form prepared by the Associated General Contractors of Minnesota, for the excavation and grading work called for by the plans and specifications for the Hillwind Office Plaza project.

Numbered paragraph 7 of the undertakings to which the Subcontractor agreed in the Standard Subcontract provided an all-encompassing indemnity agreement secured by insurance:

To obtain, maintain and pay for such insurance as may be required by the General Contract, the rider attached hereto, or by law, and to furnish the Contractor satisfactory evidence that it has complied with this paragraph, and to obtain and furnish to the Contractor an undertaking by the insurance company issuing each such policy that such policy will not be cancelled except after fifteen (15) days notice to the Contractor of its intention to so do.

The Subcontractor agrees to assume entire responsibility and liability, to the fullest extent permitted by law, for all damages or injuries to all persons, whether employees or otherwise, and to all property, arising out of it, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract or occurring or resulting from the use by the Subcontractor, his agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by the Contractor, the Subcontractor or third parties, and the Subcontractor, to the fullest extent permitted by law, agrees to indemnify and save harmless the Contractor, his agents and employees from · all such claims including, without limiting the generality of the foregoing, claims for which the Contractor may be or may be claimed to be, liable and legal fees and disbursements paid or incurred to enforce the provisions of this paragraph and the Subcontractor further agrees to obtain, maintain and pay for such general liability insurance coverage and endorsements as will insure the provisions of this paragraph.

Two riders were attached to and made a part of the Subcontract. Attachment A was the printed insurance rider provided for attachment to the AGC Standard Subcontract Agreement. That form describes the types and limits of liability of the insurance which the Subcontractor was to obtain, and it generally parallels paragraph 11.1 of the contract between the owner and the general contractor. The insurance rider, however, required 30 days notice of intent to cancel rather than the 15 days provided in the Standard Subcontract. No doubt because the all-encompassing indemnity agreement

set out at numbered paragraph 7 of the Standard Subcontract runs afoul of Minn. Stat. § 337.02 (1994), which was first enacted in 1983, the parties modified numbered paragraph 7 by typewritten Attachment B:

> Notwithstanding the provisions of Paragraph 7 of this Subcontract Agreement, the indemnity set forth therein shall apply only to the extent that the underlying injury or damage is attributable to the negligence or otherwise wrongful act or omission, including breach of a specific contractual duty, of Subcontractor or Subcontractor's independent contractors, agents, employees or delegatees. Subcontractor further agrees to indemnify, defend and save harmless Contractor, his agents and employees, from and against all claims arising within the scope and types and limits of insurance Subcontractor has agreed to obtain, maintain and pay for pursuant to this Subcontract Agreement (a) to the same extent as said insurance if Subcontractor fails to obtain and keep in force said insurance and (b) to the full extent of the deductible amount of self-insured retention of said insurance.

When Attachment B is made a part of numbered paragraph 7, amended paragraph 7 provides as follows:

> To obtain, maintain and pay for such insurance as may be required by the General Contract, the rider attached hereto, or by law, and to furnish the Contractor satisfactory evidence that it has complied with this paragraph, and to obtain and furnish to the Contractor an undertaking by the insurance company issuing each such policy that such policy will not be cancelled except after thirty (30) days notice to the Contractor of its intention to so do.

> The Subcontractor agrees to assume entire responsibility and liability, to the fullest extent permitted by law, for all damages or injuries to all persons, whether employees or otherwise, and to all property, arising out of it, resulting from or in any manner connected with, the execution of the work provided for in this Subcontract or occurring or resulting from the use by

the Subcontractor, his agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by the Contractor, the Subcontractor or third parties, and the Subcontractor, to the fullest extent permitted by law, agrees to indemnify and save harmless the Contractor, his agents and employees from all such claims including, without limiting the generality of the foregoing, claims for which the Contractor may be or may be claimed to be, liable and legal fees and disbursements paid or incurred to enforce the provisions of this paragraph[; provided, however, that] the indemnity set forth [herein] shall apply only to the extent that the underlying injury or damage is attributable to the negligence or otherwise wrongful act or omission, including breach of a specific contractual duty, of Subcontractor or Subcontractor's independent contractors, agents, employees or delegatees. [T]he Subcontractor further agrees to obtain, maintain and pay for such general liability insurance coverage and endorsements as will insure the provisions of this paragraph. Subcontractor further agrees to indemnify, defend and save harmless Contractor, his agents and employees, from and against all claims arising within the scope and types and limits of insurance Subcontractor has agreed to obtain, maintain and pay for pursuant to this Subcontract Agreement (a) to the same extent as said insurance if Subcontractor fails to obtain and keep in force said insurance and (b) to the full extent of the deductible amount of self-insured retention of said insurance.

The first paragraph of numbered paragraph 7 is unchanged by Attachments A and B except for the change from 15 to 30 days notice of cancellation provided in Attachment A. But although Attachment A does not otherwise modify the language of numbered paragraph 7, it does set out the types of insurance and the limits of liability of those coverages which Imperial Developers was required to obtain. It is apparent from the certificate of insurance furnished Kraus–Anderson, which is identified as the certifi-

cate holder, that Imperial Developers did, in fact, procure and maintain the insurance required pursuant to the Subcontract, including Attachment A. It should also be noted that the certificate identifies only Imperial Developers as the insured and that it specifically states, "This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies listed below."

Even a cursory review of numbered paragraph 7, as amended by Attachment B, reveals that Imperial Developers agrees to indemnify Kraus–Anderson *only* to the extent that injury or damage is caused by "the negligence or otherwise wrongful act or omission, including breach of a specific contractual duty," of Imperial Developers or its sub-subcontractors. Amended paragraph 7 goes on to provide that Imperial Developers "agrees to obtain, maintain and pay for such general liability insurance coverage and endorsements as will insure the provisions of this paragraph." The undertaking to procure and maintain general liability insurance coverage which will insure the provisions of numbered paragraph 7 remains unchanged by Attachment B. The provisions of numbered paragraph 7 which are to be insured have, however, been drastically changed by Attachment B: from an agreement to fully indemnify Kraus–Anderson for all damages or injuries to any person in any manner connected with Imperial Developers' work on the project, without regard to fault, Attachment B has limited Imperial Developers' agreement to an obligation to indemnify Kraus–Anderson "only to the extent that the injury or damage is attributable to the negligence or otherwise wrongful act or omission, including breach of a specific contractual duty," of Imperial Developers or its sub-subcontractors.[1] In short, numbered paragraph 7 has been converted by Attachment B from an agreement to indemnify Kraus–Anderson for all damages and injuries in any way connected with the work to be performed pursuant to the excavation and grading Subcontract without regard to fault and

1. The concurring opinion appears to confuse judicial interpretation of a contract with rewriting the contract and the necessity for judicial interpretation with ambiguity.

to procure and maintain insurance to fund *that* undertaking to an agreement by Imperial Developers to be responsible for injury or damage attributable to its own or its subsubcontractor's negligence or other wrongful act or omission, including breach of contract, and to procure and maintain insurance to pay Imperial Developers' liability for its fault or the fault of its subcontractors to the extent of the policy limits prescribed by Attachment A. Inasmuch as the jury determined that Hurlburt's injury was not in any respect attributable to Imperial Developers' fault and that Kraus–Anderson was liable to Hurlburt solely by reason of its own fault, there was no basis either for imposing liability on Imperial Developers or for calling upon Imperial Developers' insurer for payment of sums for which Imperial Developers was liable.

Nevertheless, in mistaken reliance on *Holmes v. Watson–Forsberg Co.*, 488 N.W.2d 473 (Minn.1992), both lower courts declared that numbered paragraph 7 was simply an agreement requiring the Subcontractor to provide insurance coverage insuring the General Contractor against all liability for injury or damage in any manner connected with the Work of the Subcontract, even that resulting from the General Contractor's own negligence.

There is, of course, a difference between an indemnity agreement and an agreement to procure and maintain insurance, but in construction contracts between a prime or general contractor and a subcontractor the two are almost invariably linked. Although a general contractor's pocket is likely to be deeper than its subcontractor's, for many years the standard subcontract required the subcontractor to indemnify the general contractor and save it harmless with respect to any injury or damage in any way connected with the performance of the work of the subcontract, and it made no difference that the general contractor's negligence was the sole cause of the injury or damage. An indemnity agreement is, however, worth only as much as the indemnitor's financial ability to respond if called upon. Consequently, it became customary to assure the availability of funds by requiring the subcontractor to procure and maintain contractual liability insurance to insure the subcontractor's ability to carry out his undertaking to indemnify the general contractor. But the fact that the existence of insurance may redound to the benefit of the general contractor as well as to the insured subcontractor does not convert an agreement to indemnify and to assure the indemnitor's ability to indemnify by procuring and maintaining contractual liability insurance into an agreement to insure the general contractor, and *Holmes v. Watson–Forsberg Co.* cannot be understood to so hold.

Watson–Forsberg Co., the general contractor on a construction project in St. Anthony, entered into a Standard Subcontract with Pro–Tech Roof Systems, Inc., on March 19, 1986. The Pro–Tech subcontract included numbered paragraph 7 (identical to the numbered paragraph 7 contained in the 1985 edition of the AGC Standard Subcontract without modification by Attachment B). Holmes, an employee of Pro–Tech, was injured in a fall from the roof on November 16, 1986. *Holmes,* 488 N.W.2d at 474–75.

While Kraus–Anderson insists that numbered paragraph 7 is not an "indemnification provision" but merely a "risk allocation method" that requires the subcontractor to insure against a risk of loss regardless whose negligence is responsible for the loss, it is indeed an indemnity provision which is saved from invalidity only by its requirement that the indemnitor's contractually assumed liability be insured. Certainly, the 1985 version of numbered paragraph 7 is a "risk allocation method" which relieves the general contractor of any responsibility for its conduct and thrusts upon the subcontractor not only the cost of contractual liability insurance which assures payment of its indemnity obligation but also imposes upon the subcontractor the cost of any subsequent premium increase attributable to the general contractor's negligence.

It is hardly a profound observation to comment that business as we know it could not exist without the ability to allocate certain risks to the insurance industry. The risk allocation method urged by Kraus–Anderson is, however, singularly inefficient, for it simply stacks one layer of insurance (that which

the contract with the owner requires the general contractor to procure and maintain), atop a series of second layers (each subcontract requires each subcontractor to procure and maintain insurance covering their contractual undertaking) in order to shift the loss from the general contractor's insurer to the insurer of whichever unfortunate subcontractor's work is in some way connected with the injury or damage, whether or not the unlucky subcontractor was causally negligent.

A more efficient example of risk allocation is found in *Independent School District No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 431–32, 123 N.W.2d 793, 796–97 (1963). There the school district agreed that it would procure and maintain builders risk insurance providing fire and extended coverage on the school building, and its construction contracts with five prime contractors exonerated the prime contractors from liability for damage by fire. That method of risk allocation protected the owner and the prime contractors and placed the risk of loss by fire on an insurer at the cost of a single policy of fire and extended coverage insurance.

Moreover, the "risk allocation method" urged by Kraus–Anderson and adopted by the lower courts cannot be found in Imperial Developers' subcontract. The all-inclusive indemnification provision in the printed 1985 edition of the Standard Subcontract Agreement which describes the scope of the general liability insurance to be procured and maintained by Pro–Tech and which is discussed in *Holmes v. Watson–Forsberg Co.*, 488 N.W.2d 473 (Minn.1992), is modified in Imperial Developers' subcontract by Attachment B. It may well be that Attachment B could have been more artfully drafted, but its purport is quite clear. Imperial Developers agrees to indemnify Kraus–Anderson only to the extent that injury or damage is attributable to the negligence or other wrongful act of Imperial Developers or its subcontractors, and *that modified indemnity agreement* defines the scope of the general liability insurance with which Imperial Developers is to insure its indemnity agreement. Inasmuch as Hurlburt's injury was not in any respect attributable to Imperial Developers' negli-gence, Imperial Developers has no obligation to indemnify Kraus–Anderson and the insurance which Imperial Developers procured and maintained to insure its indemnity agreement is not applicable to Kraus–Anderson's claim. Kraus–Anderson must look to the insurer on the policy which, since the record does not suggest otherwise, we assume Kraus–Anderson procured and maintained pursuant to its contract with the owner.

Reversed.

ANDERSON, J., concurs specially.

ANDERSON, Justice (concurring specially).

I concur in the result reached by the majority, but write separately because I do not find, as the majority does, that the "purport [of Attachment B] is quite clear." Ambiguity exists when the language of a written document, by itself, is reasonably susceptible to more than one meaning. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990); *Lamb Plumbing & Heating Co. v. Kraus–Anderson, Inc.,* 296 N.W.2d 859, 862 (Minn. 1980). As is evidenced by the fact that the parties to this action have placed different interpretations on the effect of Attachment B, and two lower courts have come to conclusions regarding Attachment B's effect which are contrary to the one reached by the majority today, the purport of paragraph 7 of the Standard Subcontract Agreement between Kraus–Anderson and Imperial as modified by Attachment B is at best ambiguous.

Perhaps the better of the alternative readings of this contract is the majority's. However, I disagree with the majority's statement that paragraph 7 is an "indemnity provision which is saved from invalidity only by its requirement that the indemnitor's contractually assumed liability be insured." While the majority acknowledges that there is a difference between an indemnity agreement and an agreement to procure and maintain insurance, the majority maintains in the same breath that "the two are almost invariably linked." In my view, the statutory scheme enacted by the legislature in Chapter 337 relating to building and construction contracts, and supported by this

court in *Holmes v. Watson–Forsberg*, 488 N.W.2d 473 (Minn.1992), supports the ability of the parties to contract to "provide specific insurance coverage for the benefit of others." Minn.Stat. § 337.05, subd. 1 (1994).

The legislature has declared that agreements to indemnify for negligence beyond one's own are unenforceable. Minn.Stat. § 337.02 (1994). But, in section 337.05, the legislature specifically provided that the unenforceability of an agreement to indemnify for negligence beyond one's own does not affect the validity of an agreement to provide specific insurance. Rather than indemnity agreements and agreements to provide specific insurance being "invariably linked," these agreements, while appearing in the same document, are treated by the legislature in vastly different ways. Agreements to indemnify beyond one's own negligence are disfavored, that is, rendered unenforceable. Agreements to provide specific insurance are favored, and are enforceable. Minn.Stat. § 337.05. In fact, the legislature also provided that if a promisor agrees to provide specific insurance, even for negligence beyond his own, and does not do so, then as to a claim which arises within the scope of the specified insurance, the promisor must *indemnify* the promisee to the extent of the promised insurance. Minn.Stat. § 337.05, subd. 2. By supporting agreements to provide insurance for the negligence of another, the legislature has acknowledged the public interest in providing adequate compensation for construction-related injuries and has acknowledged the practical need for the allocation of risk in the performance of construction contracts. However, in so doing, the legislature has required that such agreements to provide insurance be specific.

The parties to this contract agreed that Imperial would "obtain, maintain and pay for such general liability insurance coverage and endorsements as will insure the provisions of this paragraph." Such agreements are favored and we have articulated the policy underlying the protection of contracts to provide insurance, stating that:

> the legislature both anticipated and approved a long-standing practice in the construction industry by which the parties to a subcontract could agree that one party would purchase insurance that would protect "others" involved in the performance of the construction project. Such a risk allocation method is a practical response to problems inherent in the performance of a subcontract and, in instances where the risk of loss is one directly related to and arising out of the work performed under the subcontract, the parties are free to place the risk of loss upon an insurer by requiring one of the parties to insure against that risk.

*Holmes,* 488 N.W.2d at 475.

As I previously stated, the agreement to provide insurance between Kraus–Anderson and Imperial is at best ambiguous. It is susceptible to more than one reasonable interpretation. The majority rewrites this contract in a way that has written out the inherent ambiguity in the contract language. In my view, the reason that the agreement to provide insurance does not include the negligence of Kraus–Anderson in this instance is that the parties failed to adhere to section 337.05's requirement of specificity. They failed to agree that Imperial would "provide *specific* insurance."