**ARROWHEAD ELECTRIC COOPERATIVE, INC., Plaintiff,**

**Hartford Steam Boiler Inspection and Insurance Company, Respondent,**

v.

**LTV STEEL MINING COMPANY, Appellant (C8–97–580),**

**Defendant (CX–97–581),**

**Youngstown Erie Corporation, et al., Defendants (C8–97–580),**

**Cliffs Mining Company, Appellant (CX–97–581).**

Nos. C8–97–580, CX–97–581.

Court of Appeals of Minnesota.

Sept. 16, 1997.

Richard B. Allyn, Tyrone P. Bujold, Richard W. Bale, Robins, Kaplan, Miller & Ciresi, South, Minneapolis, for Hartford Steam Boiler Inspection and Insurance Company.

G.W. Harries, Mark D. Pilon, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, Duluth, for LTV Steel Mining Company.

James P. Paciotti, Magie, Andresen, Haag, Paciotti, Butterworth & McCarthy, Duluth, for Cliffs Mining Company.

Considered and decided by LANSING, P.J., and RANDALL, and HARTEN, JJ.

## OPINION

LANSING, Judge.

The insurer of an electrical cooperative brought this subrogation action against mining companies to recover payments for property damage caused by the collapse and liquification of a large ash heap. The district court ruled that an exculpatory clause in a contract with the electrical co-op exonerated the mining companies from strict liability but was unenforceable because it violated public policy. We affirm the construction of the exculpatory clause but reverse the determination that the exculpatory clause violated public policy. We also affirm the inapplicability of the act of God defense, and we remand for further proceedings to determine whether the mining companies are liable for willfully causing the damage.

## FACTS

LTV Steel Mining Company owns an ore and taconite handling plant at Taconite Harbor, Minnesota. LTV is managed by Cliffs Mining Company. LTV agreed to allow United Power Association (UPA), an electrical cooperative, to maintain electrical substation facilities on LTV's property. The parties' negotiated contract included an exculpatory clause, exonerating LTV from liability for damage to or destruction of any of UPA's facilities "under any circumstances," unless willfully caused by LTV.

Between 1957 and June 1982, LTV and Cliffs (collectively LTV) deposited waste ash, generated by LTV's plant, on an ash heap located uphill from UPA's facility. The heap consisted of approximately 770,000 cubic yards of waste ash, covering approximately 27 acres. When the contract was agreed to, much of the ash heap was covered with top soil, grass, legumes, and new growth trees.

In March 1991, LTV applied to the Minnesota Pollution Control Agency (MPCA) for a permit to resume depositing ash on the heap. The MPCA investigated and determined that the deposits could be polluting Lake Superior through rain and other water run-off. The MPCA issued a "no discharge" requirement, ordering LTV to stop the release of water from the ash pile.

LTV had several options for compliance, including placing a clay cover over the ash pile or hauling away the water from the ash pile. Instead, LTV opted to construct a containment and recirculation system, consisting of a large pond on the downhill side of the ash heap to collect surface runoff and leachate water. Water was pumped from the pond to the top tier of the ash heap, sprayed back onto the heap, and dispersed by "evapotranspiration"; i.e., evaporation of water through the vegetation covering the ash pile. This system was approved by the MPCA.

LTV also hauled excess water from a coal stockpile and dumped the water into the pond or directly onto the ash heap. The level of water in the ash heap was increased by above normal rainfall in July 1993. On July 28, 1993, the ash heap became saturated and liquified (a rare phenomenon called "static liquefaction"). A large part of the ash heap collapsed, and a mixture of ash and water flowed downhill, causing damage to UPA's facilities.

For damages resulting from the ash slide, UPA recovered $509,345.38 from its casualty insurer, Hartford Steam Boiler Inspection and Insurance Company. Hartford brought this subrogation action against LTV on theories of negligence, trespass, nuisance, and strict liability. LTV denied liability and affirmatively alleged that an act of God (the above-normal July rainfall) caused the ash heap's collapse.

In ruling on the parties' motions for summary judgment, the district court concluded that the exculpatory clause barred Hartford's general negligence claims but did not bar Hartford's claims of willfully reckless or intentional conduct, based on trespass and nuisance. The court concluded that, with respect to Hartford's claim for damages based on principles of strict liability, the exculpatory clause was void as a matter of public

policy. The court rejected LTV's act of God defense and held LTV strictly liable for the damage to UPA's facilities.

## ISSUES

I. Did the district court err by concluding that the exculpatory clause encompassed acts subject to principles of strict liability?

II. Did the district court err by concluding that the exculpatory clause was void as a matter of public policy with respect to the strict liability claim?

III. Did the district court err by rejecting LTV's act of God defense?

IV. Did the district court err by finding that Hartford had presented sufficient evidence to create a fact issue on the question of whether LTV's "willful" acts caused the damage to UPA's facilities?

## ANALYSIS

### I

■ Whether a contract clause is ambiguous is an issue of law. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982). On appeal we review issues of law independently. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 822 (Minn.1977). Ambiguity exists when the language of a written document, by itself, is reasonably susceptible to more than one meaning. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990) (citations omitted).

■ The parties' exculpatory clause stated that LTV would

have no liability under any circumstances for interruptions in supply of energy or, unless willfully caused * * * for damage to or destruction of any of [UPA's] facilities.

The district court ruled that although this agreement did not expressly mention "strict liability," the exoneration from liability for "any" nonwillful damage to UPA's facilities unambiguously encompassed acts ordinarily subject to principles of strict liability. We agree that the plain language provides that LTV is liable only for willfully caused damage or destruction to UPA's facilities. Consequently the clause excuses LTV from strict liability for its acts resulting in damage unless the damage is willfully caused.

### II

■ An agreement that violates public policy is void. *Ind. Sch. Dist. No. 877· v. Loberg Plumbing & Heating Co.,* 266 Minn. 426, 434, 123 N.W.2d 793, 799 (1963). An exculpatory clause does not necessarily contravene public policy and may be valid in certain circumstances; however, this type of agreement is "not favored in the law." *Schlobohm v. Spa Petite,* 326 N.W.2d 920, 923 (Minn.1982). An exculpatory clause is "strictly construed against the benefited party." *Id.*

■ The district court expressed a reluctance to enforce an agreement that attempts to shift a party's responsibility for damages resulting from an act that would otherwise subject the party to strict liability. We agree that enforcing the plain language of the clause alters the ordinary liability pattern and undermines the rationale supporting strict liability. Strict liability is intended to internalize the costs of abnormally dangerous activities; in other words, the dangerous enterprise should be required to "pay its way." W. Page Keeton, *Prosser and Keeton on Torts,* § 75 at 536 (5th ed.1984). Therefore, a contract clause exculpating a party for its strict liability may be particularly vulnerable to public policy concerns. *See Weirick v. Hamm Realty Co.,* 179 Minn. 25, 28–29, 228 N.W. 175, 176–77 (1929) (pointing out rule in Minnesota that although party may contract against liability for his own negligence, he cannot contract away duty imposed by law); *Burgan v. City of Pittsburgh,* 115 Pa. Cmwlth. 566, 542 A.2d 583, 589 (1988) (refusing to enforce indemnity provision in part because permitting party to contract away strict liability "would weaken incentives to employ utmost safety precautions for protection of the public").

■ On the other hand, public policy " 'requires that freedom of contract shall remain inviolate, except only in cases which contravene public right or the public welfare.' " *Weirick,* 179 Minn. at 28, 228 N.W. at 176 (quoting *Buck v. Walker,* 115 Minn. 239, 132 N.W. 205, 207 (1911)). When an

exculpatory clause is within the range of permissible agreement and the parties' intentions are reasonably apparent, public policy demands that the parties be bound by their agreement. *Loberg Plumbing & Heating Co.*, 266 Minn. at 434, 123 N.W.2d at 799; *see also Morgan Co. v. Minnesota Mining & Mfg. Co.*, 310 Minn. 305, 312, 246 N.W.2d 443, 448 (1976) (concluding that commercial entities could agree to limit seller's liability for claims based on strict product liability); *Weirick*, 179 Minn. at 30, 228 N.W. at 177 (concluding that lessor could privately contract with lessee to limit damages when agreement was one "with which the general public is not concerned");

■ When considering the validity of an exculpatory clause, the courts apply a two-prong test, examining

(1) whether there was a disparity of bargaining power between the parties (in terms of a compulsion to sign a contract containing an unacceptable provision and the lack of ability to negotiate elimination of the unacceptable provision) * * * and (2) the types of services being offered or provided (taking into consideration whether it is a public or essential service).

*Schlobohm*, 326 N.W.2d at 923 (citing *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981)).

There is no supportable claim that there was a disparity in bargaining power between UPA and LTV, that there was a lack of ability for UPA to negotiate effectively, or that UPA could not locate its facilities elsewhere if it considered the exculpatory clause to be unacceptable. *See Schlobohm*, 326 N.W.2d at 924–25 (stating requirement for demonstrating adhesion contract).

We must also consider the nature of the services to determine whether there is a duty to the public. *Id.* at 923; *Jones*, 623 P.2d at 376. The maintenance of the ash heap was subject to regulation by the MPCA. But the parties' contract involved the location of an electrical substation, not the providing of a service " 'of great importance to the public, which is often a matter of practical necessity for some members of the public.' " *Jones*, 623 P.2d at 376 (quoting *Tunkl v. Regents of the Univ. of Cal.*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 444 (1963);) *see also Schlo-*

*bohm*, 326 N.W.2d at 925 (listing public or essential services subject to regulation). Furthermore, the contract was limited to exonerating LTV from liability for property damage to UPA's facilities. The contract did not seek to regulate or limit LTV's responsibilities for bodily injury or other injuries to members of the public.

Under these circumstances, the parties were free to re-allocate to UPA the risk of damage to UPA's own commercial property resulting from an activity that may have otherwise subjected LTV to claims of strict liability. *See Armstrong v. Mailand*, 284 N.W.2d 343, 351–52 (Minn.1979) (concluding that plaintiff may assume risk by manifesting consent to relieve defendant from actions based on strict products liability or strict liability for an abnormally dangerous activity); *T & E Indus., Inc. v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249, 1258–59 (1991) (citing *Restatement (Second) of Torts*, § 523 (1977) for proposition that buyer may knowingly and voluntarily assume risk of harm from abnormally dangerous activity).

In concluding that the parties' agreement did not violate public policy, we assume that UPA was aware of the ash heap at the time it agreed to assume the risk of damage, and that LTV did not fail to disclose to UPA any known, hidden risks. *See Breimhorst v. Beckman*, 227 Minn. 409, 417, 35 N.W.2d 719, 726 (1949) (lessor has duty to disclose concealed, dangerous conditions of which he has knowledge). In the absence of any argument by UPA to the contrary, we must assume that LTV did not hide from UPA the existence of the ash heap or any attendant, hidden risks of which LTV was aware.

### III

LTV raised an act of God defense, claiming that but for the heavy rains that fell in July 1993, the ash heap would not have become saturated. The district court rejected this defense, concluding that LTV had cited no evidence that the July rainfall was "unexpected and unforeseeable." *See Vanden Broucke v. Lyon County*, 301 Minn. 399, 405, 222 N.W.2d 792, 796 (1974) (stating that to be an act of God, event must be both unexpect-

ed and unforeseeable) (citing *Swanson v. La Fontaine*, 238 Minn. 460, 57 N.W.2d 262 (1953)).

 Even if we were to conclude that an act of God is a defense to strict liability,[1] the record evidence indicates only that the rain in July 1993 was "heavy," and that the month was "extremely wet," and "significantly wetter than normal." As the district court found, there was no affidavit evidence that the amount of rainfall in July 1993 was unexpected or unforeseeable.

## IV

The parties' exculpatory clause stated that LTV would remain liable for damage or destruction that was "willfully caused" by LTV. *See Schlobohm*, 326 N.W.2d at 923 (stating that an exculpatory clause may not shield a party from intentional, willful, or wanton acts).

 The district court concluded that Hartford had presented sufficient evidence to create a fact issue on the question whether LTV's operation of the ash heap containment and recirculation system was willfully reckless. The court cited an expert affidavit stating that the recirculation of water was reckless because the ash heap showed obvious signs of instability. The expert's affidavit stated that LTV should have investigated the toe of the heap which, for several years, had been eroding or "slumping." The affidavit also characterized LTV as reckless because it deliberately ignored the danger posed by the huge size and unconsolidated nature of the ash heap, combined with its location on a hill. The affidavit stated that LTV had not assessed or evaluated the question whether hauling additional water from a coal stockheap and dumping the water in the pond or directly on the ash heap was safe or could result in liquefaction and failure. This evidence was sufficient to create a jury question whether the damage to UPA's facilities was "willfully caused" by LTV. *See Garrity v. Kemper Motor Sales*, 280 Minn. 202, 207, 159 N.W.2d 103, 107 (1968) (characterizing failure to answer discovery request as "willful" only

when, despite knowledge of a duty to respond, there is a "deliberate, conscious, and intentional choice" to disregard the duty); *Thoen v. First Nat'l Bank*, 199 Minn. 47, 51, 271 N.W. 111, 113 (1937) (defining "willful" act, according to Webster's New International Dictionary [2d. ed.1935], as "governed by will without yielding to reason; obstinate; perverse; stubborn").

## DECISION

The district court did not err by rejecting LTV's act of God defense or by concluding that Hartford had presented sufficient evidence to create a question of fact on whether LTV's actions willfully caused the damage to UPA's facilities. The court properly concluded that the parties' exculpatory clause encompassed strict liability; however, under these facts the court erred by concluding that the clause violated public policy.

**Affirmed in part, reversed in part, and remanded.**

---

1. The "strong current of authority" is that an act of God is a defense to strict liability. W. Page Keeton, *Prosser and Keeton on Torts*, § 79 at 563 (5th ed.1984).